IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THOMAS HICKEY and PERFORMANCE CONCEPTS & TECHNOLOGIES, LLC, | * |
| | * |
| *Plaintiffs*, | * |
| | * |
| v. | Civil Action No. RDB-23-2224 |
| | * |
| TRANSLATIONAL TECHNOLOGIES INTERNATIONAL, LLC, and APRIL ZAMBELLI-WEINER, | * |
| | * |
| | * |
| *Defendants*. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

From February 28 to October 3, 2022, Plaintiff Performance Concepts & Technologies, LLC ("Performance Concepts"), was a sales development consultant to a medical research and consulting company, Defendant Translational Technologies International, LLC ("TTi"). (ECF No. 1) TTi and Performance Concepts entered into a Consulting Agreement on February 28. (ECF No. 32-2 at 7–12) Under that Agreement, Performance Concepts and Plaintiff Thomas Hickey would serve as business development consultants to TTi, working closely alongside Defendant Dr. April Zambelli-Wiener, TTi's owner, chief executive officer, and principal member.[1] (ECF No. 32-1 at 4, 7 ¶¶ 9–10). Performance Concepts' role under the Consulting Agreement was to help TTi increase its revenue by bringing in new clients across the medical technology, medical device, and life science research industries. (ECF No. 32-1 at 7 ¶¶ 9–10;

---

[1] Over no objection, the Court granted summary judgment for Dr. Zambelli-Weiner on the record at the November 10, 2025 hearing on these Motions. (ECF No. 48)

ECF No. 32-2 at 3 ¶¶ 11–12). Not satisfied with Performance Concepts' execution of its responsibilities under the Agreement, TTi ended the consulting relationship on October 3, 2022. (ECF No. 32-2 at 48; ECF No. 48) Ten months later, on August 15, 2023, Plaintiffs filed a five-count Complaint. (ECF No. 1)

Four of the five counts are personal claims made by Hickey. Counts I, II, and III represent Hickey's claim that he was an employee of TTi and is entitled to benefits under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219, the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401 *et seq.* (West 2025), by not paying him in August or September. (*Id.* ¶¶ 66–75) Count III claims that Defendants violated the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq.* (West 2025). (*Id.*) Hickey's fourth personal claim is one for breach of contract. (*Id.*) On September 21, 2023, Defendants filed their Answer, which included a four-count Counterclaim brought by Counterclaimant TTi. (ECF No. 8) After lengthy discovery, each party moved for partial summary judgment. Defendants seek partial summary judgment on Plaintiff Hickey's Counts I–IV. (ECF No. 32) Hickey and Performance Concepts seek partial summary judgment on TTi's Counterclaim. (ECF No. 33)

On November 10, 2025, the Court heard argument on the Motions. (ECF No. 48) For the reasons detailed on the record and further explained below, the Court GRANTS Defendants' Motion for Partial Summary Judgment (ECF No. 32). With respect to Counterdefendants' Motion for Partial Summary Judgment on TTi's counterclaims (ECF No. 33), the Court DENIES summary judgment on Counts I and IV. It further DENIES summary judgment as to Counterdefendant Hickey on Counts II and III. Finally, the Court GRANTS

summary judgment as to Counterdefendant Performance Concepts on Counts II and III.

## BACKGROUND

In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### I.    Factual History

Defendant Translational Technologies International, LLC, is a clinical research company that provides medical-related research and consulting services. (ECF No. 32-1 at 5 ¶ 2; ECF No. 32-2 at 1 ¶ 3) Defendant April Zambelli-Weiner is TTi's owner, CEO, and managing member. (ECF No. 32-2 at 12) Plaintiff Performance Concepts & Technologies, LLC, is a sales development consulting company. (ECF No. 40-2 at 2) Plaintiff Thomas Hickey is Performance Concepts' owner and sole member. (ECF No. 32-2 at 12).

On February 28, 2022, TTi entered into a sales development Consulting Agreement ("Agreement") with Performance Concepts. (ECF No. 32-1 at 5 ¶ 1) Hickey had previously worked as a consultant for TTi through another company he owned and operated, TAGGA Strategic Consulting. (ECF No. 32-2 at 1 ¶ 4) Hickey executed the agreement for Performance Concepts; Dr. Zambelli-Weiner executed it for TTi. (*Id.* at 12) The Agreement called for Performance Concepts to act as a sales development consultant, based on Hickey's expertise in networking and sales origination in the medical technology, medical device, and life science research industries. (ECF No. 32-1 at 7 ¶¶ 9–10; ECF No. 32-2 at 3 ¶¶ 11–12) The parties entered the Agreement with the dual missions of "increas[ing] topline revenue for TTi's market access consulting services" and "support[ing] client relationship management with market

access expertise throughout the customer lifecycle." (ECF No. 32-2 at 14) In essence, TTi contracted with Performance Concepts to grow and maintain its customer base.

During email negotiations leading up to the parties entering the Consulting Agreement, dated February 24, 2022, Hickey and two members of TTi's senior management (Chief Administration Officer Daniel Weiner and Chief Operations Officer Denise Underwood) discussed Hickey's role. (ECF No. 32-2 at 16–18) He referenced "a list of initiatives that [he] w[ould] bring upon signing" and "carve outs," including "Pitch Pro and Med Tech Gurus." (*Id.* at 17–18) He explained in reference to those two carve outs that "[t]here is a great deal here in commercial activity however as discussed help the [A]greement survive and [*sic*] IRS audit." (*Id.* at 18.) In response, Weiner stated, "we will need to carve out the non-compete activities that you want to keep outside of TTi – a list might be helpful and I can include it in the agreement." (*Id.*) The final agreement included a non-compete clause under which, "Clients that Consultant has a contractual relationship with prior to the effective date of this contract or via Med Tech Gurus are exempted. Pitch Pro will be made available for TTi projects and TTi has the right to refuse potential clients, which will also be exempted from this agreement." (ECF No. 32-2 at 9)

The Agreement was executed February 28 and included the following relevant terms:

(1) all compensation for services and expenses would be paid to Performance Concepts (*id.* at 13);
(2) Performance Concepts would submit a monthly invoice to TTi describing the time worked and services provided (*id.*);
(3) TTi would, with prior written agreement and upon receipt of "a complete, correct, and audit-worthy invoice," reimburse Performance Concepts' "expenses incurred . . . directly related to each assignment . . . includ[ing] travel expenses incurred for any meetings held or attended related to [Performance Concepts'] assignment" (*id.*);

4

(4) Performance Concepts would indemnify and hold harmless TTi "against all losses, damages, liabilities, deficiencies, actions, judgments, interest, award, penalties, fines, costs, or expenses of whatever kind (including reasonable attorney's fees), only to the extent caused by, arising out of, or relating to the work of [Performance Concepts], or resulting from [its] breach of any representation or warranty" (*id.* at 10);

(5) Performance Concepts would "operate at all times as an independent contractor of TTi" and the Agreement would not authorize Performance Concepts to act as TTi's "agent or make commitments" on its behalf (*id.* at 11);

(6) TTi would "not withhold payroll taxes," and Performance Concepts would "not be covered by health, life, disability, or worker's compensation insurance of TTi" (*id.*)

(7) Performance Concepts would be "required to maintain and in full force and effect Professional Liability Insurance . . . during the effective period of this Agreement, and in the amount of" one million dollars and TTi would "be named a Certificate Holder" (*id.* at 13); and

(8) The Agreement would "be in the final expression of their agreement with respect to the retention of [Performance Concepts] by TTi and [were] not [to] be contracted by evidence of any prior or contemporaneous agreement" (*id.* at 12).

Although the Agreement was entered by Performance Concepts and TTi, Hickey himself provided all consulting services to TTi on behalf of Performance Concepts, as he was Performance Concepts' only employee. (*Id.* at 3 ¶¶ 12–13; ECF No. 40-1 at 2 ¶ 10; ECF No. 40-2 at 5) As noted previously, TTi contracted with Performance Concepts because it sought sales development; Hickey testified that he believed that TTi wanted him to be their "sales guru" and valued his expertise working with small companies to commercialize their products and services. (ECF No. 40-2 at 2)

For the duration of Performance Concepts' relationship with TTi, Hickey worked remotely from Michigan, even though TTi maintains its office in Maryland. (ECF No. 32-3 at 4) He attested at his deposition that he never once traveled to Maryland for work. (*Id.*) TTi

provided Hickey with a laptop and email address. (ECF No. 40 at 10) Performance Concepts paid for wireless internet service for Hickey's remote work. (ECF No. 32-3 at 7) It may also have purchased a printer, though Hickey could not conclusively remember at his deposition. (*Id.*) Each month, Performance Concepts invoiced TTi for a monthly fee pursuant to the Agreement's terms. (ECF No. 32-2 at 2–3 ¶ 10) TTi did not pay Hickey directly.

TTi did not control Hickey's work schedule except that the Consulting Agreement required "40 hours of measurable effort weekly in alignment with TTi normal business practices and needs." (ECF No. 32-2 at 3 ¶¶ 14–17) The Agreement provided that flexibility would be assumed on working hours, "with the expectation that internal team work [would] be completed during business hours and client facing work [would] be completed as per client and market demands." (*Id.* at 14) Hickey maintained control over how he performed sales work, but Translational Technologies provided input regarding the areas of business he should develop and sell. (*Id.* at 4 ¶ 16) Moreover, Hickey was not required to follow any of Translational Technologies' employee procedures to record time, request time off, or comply with other employment related polices or procedures. (*Id.* at 4 ¶ 17)

On October 3, 2022, TTi sent a letter to Performance Concepts terminating the Consulting Agreement. (ECF No. 32-2 at 48) Though the letter does not expound on this, it states that "[t]he reason(s) for this termination is/are: Termination for cause; failure to perform." (*Id.*) At the hearing on these Motions, TTi's counsel proffered that TTi terminated the agreement because it felt it was not seeing results from its relationship with Performance Concepts. (ECF No. 48)

## II.    Procedural History

Over ten months after TTi terminated the Agreement, in August 2023, Plaintiffs filed this five-count lawsuit. (ECF No. 1) Counts I–IV are brought by Plaintiff Hickey. (*Id.*) Count V is lodged by Plaintiff Performance Concepts. (*Id.*) Defendants did not move for summary judgment on Count V; it is not at issue here.

In Count I, Hickey asserts violations by both Defendants of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219. (*Id.* ¶¶ 55–65) Hickey claims that Defendants violated FLSA § 206 by not paying him any wages from August to September 2022. (*Id.*) Counts II and III are parallel state claims brought under Maryland's FLSA corollaries. Count II alleges that Defendants violated the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401 *et seq.* (West 2025), by not paying him in August or September. (*Id.* ¶¶ 66–75) Count III claims that Defendants violated the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq.* (West 2025), by short-paying him in May, June, and July 2022; not paying him at all in August and September; and not reimbursing him for the costs of attending a conference. (*Id.* ¶¶ 76–83) Here, Hickey particularly avers that he is owed $47,541.65 and seeks treble damages. (*Id.*) In Count IV, Hickey alleges a breach of contract claim against Defendant TTi. (*Id.* ¶¶ 84–90)

One month after Plainitffs filed their Complaint, Defendants filed their Answer, which also included a four-count Counterclaim by TTi. (ECF No. 8) Count I alleges a breach of contract against Performance Concepts. (*Id.* at 17–18 ¶¶ 20–28) Count II alleges tortious interference with business relations against both Performance Concepts and Hickey. (*Id.* at 18–19 ¶¶ 29–32) Count III alleges misappropriation of trade secrets in violation of the Maryland

Uniform Trade Secrets Act, Md. Code Ann., Com. Law §§ 11-201 *et seq.* (West 2025), against both Performance Concepts and Hickey. (*Id.* at 19–20 ¶¶ 33–40) Finally, Count IV alleges indemnification against Performance Concepts and flows from the breach of contract claim in Count I. (*Id.* at 21 ¶¶ 41–43) Each of these claims centers on the same factual allegations. TTi alleges that Performance Concepts and Hickey had access to TTi's proprietary and confidential information about its past, current, and prospective clients. (*Id.* at 14–15 ¶¶ 3–6) It further alleges that Counterdefendants solicited and diverted business away from TTi. (*Id.* ¶¶ 7–19) TTi claims that Hickey and Performance Concepts took actions which caused two companies with whom TTi had or was attempting to have client relationships, Sirtex Medical Company, Limited (a prospective client), and Dickson (a current client), to leave or not contract with TTi for the benefit of Performance Concepts and Hickey. (*Id.* ¶¶ 7–19) TTi alleges that the timing of these transactions maps onto the end of Hickey's working relationship with TTi. (*Id.*)

In the two years since Counterclaimants filed, the parties have engaged in lengthy discovery, including moving this Court several times to extend discovery deadlines. (ECF Nos. 23, 25, 27, 29, 31) The parties filed the pending Motions for Partial Summary Judgment on November 15, 2024. (ECF No. 32; ECF No. 33) They then jointly moved for a sixty-day stay of the case to accommodate scheduling difficulties regarding the deposition of Defendant Dr. Zambelli-Weiner. (ECF No. 35) The Court granted that stay by Marginal Order on December 2, 2024. (ECF No. 36) On January 30, 2025, the parties asked the Court to resume briefing on the Motions and submitted a proposed schedule. (ECF No. 37) The Court approved that schedule by Marginal Order on the same day. (ECF No. 38) The parties completed their briefing on April 21, 2025. (ECF No. 41; ECF No. 42) The Court lifted the stay order on

November 4, 2025 (ECF No. 46), and heard argument on both Motions on November 10, 2025. (ECF No. 48) The matter is ripe for review.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper where the moving party shows that there is no genuine dispute as to any material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); *United States v. Stover*, 131 F.4th 199, 202 (4th Cir. 2025). At this stage, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is genuine when it is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* While the burden of showing that there is no genuine dispute of material fact rests with the movant, the nonmoving party may not rest on his complaint if the movant has filed a "properly supported motion for summary judgment." *Id.* Further, at this stage, the judge's role is not to weigh the evidence and determine the truth of the matter, as those tasks are quintessentially the province of the jury. *Id.* Instead, the Court's role is to determine whether the issues should be submitted for the jury to resolve at trial. *Id.*; *see also Grp. Home on Gibson Isl., LLC v. Gibson Isl. Corp.*, 144 F.4th 522, 539 (4th Cir. 2025) (explaining that summary judgment not appropriate when evidence in the record presents "two sides to the same story"). With that, trial courts within the United States Court of Appeals for Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club,*

*Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

### I.     Defendants' Motion for Partial Summary Judgment on Plaintiffs' Counts I–IV (ECF No. 32)

Defendants seek partial summary judgment on Plaintiffs' Counts I–IV. (ECF No. 32) They argue that summary judgment is proper on Counts I–III because only employees may seek recovery under the Fair Labor Standards Act and its Maryland corollaries and Hickey was an independent contractor, not an employee. (ECF No. 32-1 at 12–21) Separately, Defendants also seek summary judgment on Counts II and III, arguing that Maryland's wage laws do not apply extraterritorially to Hickey's work from Michigan. (*Id.* at 12) These arguments are related in that each asserts that Hickey is barred from bringing his respective claims, making summary judgment on them proper. Finally, Defendants ask the Court to grant summary judgment on Count IV, a breach of contract claim lodged by Hickey against TTi, because Hickey was not party to the Consulting Agreement and therefore cannot sue under it. (*Id.* at 22) For the reasons given on the record and explained further below, Defendants are entitled to summary judgment on Plaintiffs' Counts I, II, III, and IV.

#### a.   Whether Hickey Was an Independent Contractor or Employee (Counts I–III)

Defendants argue that they are entitled to summary judgment on Hickey's Counts I–III because he was an independent contractor and thus barred from suing under the FLSA or Maryland's wage laws. (ECF No. 32-1 at 12–21) Hickey counters that he was an employee of TTi. (ECF No. 40 at 5–11) For the reasons that follow, this Court holds that Hickey's

relationship with TTi was that of an independent contractor, and not an employee, and so the Defendants are entitled to summary judgment on Counts I–III.

As noted previously, Count I alleges that both Defendants violated the § 206 of FLSA by not paying Hickey a minimum wage for August and September 2022. (ECF No. 1 ¶¶ 55–65) Count II claims the failure of both Defendants to pay a minimum wage under the Maryland Wage and Hour Law. (*Id.* ¶¶ 66–75) Count III alleges that both Defendants violated the Maryland Wage Payment and Collection Law by short-paying Hickey for April, May, and June 2022; not paying him at all in August and September; and not reimbursing him for the costs of attending a conference. (*Id.* ¶¶ 76–83) There is no dispute that the federal statute and state statutes relied upon by Hickey in Counts I–III apply only to employees and not to independent contractors, among other classes of workers. *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006). Independent contractors are outside the zone of interests of these statutes and may not seek recovery under them. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–30 (2014) (discussing statutory zones-of-interests limitations).

A claim under the FLSA "run[s] parallel to" Maryland wage law claims, meaning that Court's "analysis of federal law extends as well to the state law claims." *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 240 (4th Cir. 2016). Additionally, the Fourth Circuit has recognized that the determination of employee status is "ultimately a legal question," thus appropriate for decision at the summary judgment stage. *Id.*

The FLSA defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(d). This definition is intentionally broad, *see Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)), so

as to effectuate the statute's "remedial and humanitarian goals." *McFeeley*, 825 F.3d at 240 (*Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999)). Nevertheless, when tasked with determining whether a worker is an employee covered by the FLSA, a district court considers "the 'economic realities' of the relationship between the worker and the putative employer." *Schultz*, 466 F.3d at 304; *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 397 (4th Cir. 2025). "This assessment is a fact-intensive inquiry, of which '[t]he focal point is whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself.'" *Chavez-Deremer*, 147 F.4th at 397 (quoting *Schultz*, 466 F.3d at 304). Six factors, called the *McFeeley* factors, guide this analysis:

(1) the degree of control that the putative employer has over the manner in which the work is performed;
(2) the worker's opportunities for profit or loss dependent on his managerial skill;
(3) the worker's investment in equipment or material, or his employment of other workers;
(4) the degree of skill required for the work;
(5) the permanence of the working relationship; and
(6) the degree to which the services are an integral part of the putative employer's business.

*Id.* (citing *McFeeley*, 825 F.3d at 241). "No single factor is dispositive; again, the test is designed to capture the economic realities of the relationship between the worker and the putative employer." *Schultz*, 466 F.3d at 305 (citing *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994)). The "ultimate question" in this analysis is "whether, against the backdrop of 'the particular working relationship, the particular workplace, and the particular industry,' the 'underlying economic realities lead to the conclusion' that the workers are actually employees." *Chavez-Deremer*, 147 F.4th at 397–98 (quoting *McFeeley*, 825 F.3d at 241). "By contrast, a worker

whose profit or loss depends upon his own creativity, ingenuity, and skill is an independent contractor outside the FLSA's scope." *Salinas*, 848 F.3d at 150.[2]

At the hearing on this Motion, counsel for both parties admitted that there is a lack of caselaw concerning FLSA claims arising out of a contract between two companies. TTi does cite *Sellers v. Royal Bank of Canada*, No. 12 Civ. 1577(KBF), 2014 WL 104682, at *1 (S.D.N.Y. Jan. 8, 2014), which concerns a consulting agreement entered into with the Royal Bank of Canada by plaintiff Sellers's company, Risk Management Consultant Services, LLC. In applying the United States Court of Appeals for the Second Circuit's version of the *McFeeley* factors,[3] the Southern District of New York did not evaluate corporate structure but nevertheless found on the facts in that case that Sellers, vis-à-vis his company, was an independent contractor and not an employee. *Id.* at *6, *12.

Pursuant to the *McFeeley* case, **first**, the Court considers the degree of TTi's control over Hickey. This factor weighs in favor of finding that Hickey was an independent contractor. Central to this first factor is "whether the employer 'control[s] the meaningful economic

---

[2] Before discussing each of the *McFeeley* factors individually, the Court notes the inherent awkwardness in applying them in this case as it is, at its heart, about a contract between two corporate entities, Performance Concepts and TTi. Overwhelmingly, in cases where a plaintiff alleges employee status under the FLSA, she is an individual person (or group of persons) who contracts for herself. Indeed, that's the situation in each of the major Fourth Circuit cases on this topic. *See McFeeley*, 825 F.3d at 239 (exotic dancers); *Chavez-Deremer*, 147 F.4th at 383 (nurses); *Schultz*, 466 F.3d at 300–01 (security guards); *Salinas*, 848 F.3d at 129 (construction workers).

[3] The Second Circuit has a five-factor test to determine economic realities. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988). The Second Circuit's iteration of the test is five factors, not six, because it does not consider the worker's investment in equipment or material, or his employment of other workers—the third of the *McFeeley* factors. *McFeeley*, 825 F.3d at 241. The five factors overlapping factors are nearly identical. Moreover, both tests derive from the same landmark FLSA case, *United States v. Silk*, 331 U.S. 704, 716 (1947). *See Chavez-Deremer*, 147 F.4th at 397 (discussing *Silk*); *Brock*, 840 F.2d at 1058–59 (the same).

aspects of the business,' such that 'the worker has a viable economic status that can be traded . . . to other companies.'" *Chavez-Deremer*, 147 F.4th at 400 (quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987)). A court must "'ask whether the company retains the right to dictate the manner of the worker's performance.'" *Id.* (quoting *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1060 (6th Cir. 2019)) (internal quotations omitted). "A 'lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence.'" *Id.* (quoting *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 381 (5th Cir. 2019)) Instead, a court should focus on "'whether the worker has control over such a meaningful portion of his labor that he operates as a separate economic entity.'" *Id.* (quoting *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 666 (7th Cir. 2022)).

In *Chavez-Deremer*, where the respective workers were found to be employees, the Fourth Circuit gave great weight to the fact that the putative employer had "extensive control" over the workers' schedules. 147 F.4th at 401–02. It also gave weight to the fact that the employer required the workers to track their hours through its own timesheets, obtain signatures from clients to verify those hours, and submit the timesheets directly to the employer. *Id.* at 402. Finally, the *Chavez-Deremer* court found significant the employer's dissemination of "explicit instructions . . . regarding professional conduct and workplace expectations" and "written guidance . . . covering topics such as proper attire, punctuality, and timekeeping procedures." *Id.*

Hickey's arrangement with TTi is nearly opposite that case. Hickey had meaningful control over both his day-to-day and his long-term work. First, and foremost, he did his work remotely from Michigan without day-to-day supervision by TTi. (ECF No. 32-2 at 3 ¶¶ 13,

17) Hickey never came to TTi's offices in Maryland during the seven-month consulting relationship. (*Id.*) He was not expected to clock-in or clock-out at any specific time. (*Id.* at 3 ¶¶ 14–17) TTi's counsel attested at the hearing that Hickey took vacations at his own leisure. (ECF No. 48) He further attested that TTi had no problem with this arrangement because TTi did not intend to supervise Hickey in that way. (*Id.*)

Second, while the Consulting Agreement said that Hickey was expected to do his internal work during TTi's normal business hours (9 AM to 5 PM Monday through Friday), the Agreement says that flexibility of schedule is assumed. (*Id.* at 14) Third, and much to the same point, Hickey was not required to record time or request time off like other employees. (*Id.* at 3 ¶ 17) He was neither an hourly nor salaried worker. (ECF No. 32-2 at 2 ¶ 10) In fact, Hickey was not even paid wages by TTi—the Consulting Agreement stipulated that TTi would pay Performance Concepts, not Hickey, a consulting fee each month. (*Id.*; *id.* at 19–25 (invoices submitted by Performance Concepts to TTi)) Fourth, Hickey set his own strategy for developing business for TTi. (*Id.* at 3 ¶ 16) He had multiple meetings each week with TTi management, but, at the hearing, TTi's counsel attested that these hearings were more for Hickey to update the TTi management on his progress rather than for the management to actively supervise and direct his work. (ECF No. 48) This factor weighs strongly in favor of finding that Hickey was an independent contractor.

**Second**, the Court looks at Hickey's opportunity for profit or loss depending on his managerial skill. This factor weighs in favor of finding that he was an independent contractor. In *McFeeley*, the Fourth Circuit explained that this factor has "intuitive" relevance: "[t]he more the worker's earnings depend on his own managerial capacity rather than the company's, and

the more he is personally invested in the capital and labor of the enterprise, the less the worker is 'economically dependent on the business' and the more he is 'in business for himself' and hence and independent contractor." 825 F.3d at 243 (quoting *Schultz*, 466 F.3d at 304). Yet, "[a]n individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill." *Chavez-Deremer*, 147 F.4th at 404. Inherent in this factor is the understanding of the independent contractor as utilizing her own "'initiative, judgment[, and] foresight'" as part and parcel of her work. *Id.* (quoting *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1317 (11th Cir. 2013)).

Applied here, this factor cuts in favor of finding that Hickey was an independent contractor. Hickey stood to make a commission based on his initiative and judgment as a sales development consultant. The more ably he brought in clients, the larger his commission—his profit—would have been. This would have been the direct result of Hickey's ability to manage his own workflow, which is separate from technical proficiency. The fact that Hickey did not actually receive a commission is immaterial. Indeed, that alleged failure to pay a commission may yet be litigated in the breach of contract claim between Performance Concepts and TTi on which TTi did not seek summary judgment. (ECF No. 1) What matters here is the fact that Hickey stood to profit from his own ingenuity and initiative. Therefore, this factor weighs in favor of independent contractor status.

***Third***, the Court assesses at Hickey's investment in equipment or material, or his employment of other workers. Courts often analyze the third factor alongside the second as they contain the same internal logic: an independent contractor will invest more and risk more than an employee but will bear more profit than an employee from her success. *McFeeley*, 825

F.3d at 243. The Fourth Circuit has been clear, however, "that the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status." *Chavez-Deremer*, 147 F.4th at 406 (quoting *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) (collecting cases)). Here, TTi provided Hickey with a laptop and an email address. (ECF No. 40 at 10) He used his personal cell phone for work along with the laptop. (*Id.*) Performance Concepts paid for wireless internet to do his work from Michigan. (ECF No. 32-3 at 7) Additionally, Hickey testified in his deposition that Performance Concepts may have bought a printer for the work with TTi. (*Id.*) Paying for wireless internet service and perhaps a printer is not a significant investment in *every* industry, but this inquiry requires the Court to consider each factor "against the backdrop of 'the particular working relationship, the particular workplace, and the particular industry.'" *Chavez-Deremer*, 147 F.4th at 397–98 (quoting *McFeeley*, 825 F.3d at 241). This was sales development consulting, most all of which can be done virtually and does not require significant overhead. Moreover, the particular workplace here was Performance Concepts, of which Hickey was the only member. Against that backdrop, investing in wireless internet and perhaps a printer, along with paying his own phone bill, is not an insignificant investment in business. Put simply, there is not much more investment that *could* have been made for Performance Concepts' work. This factor weighs in favor of Hickey having been an independent contractor.

**Fourth**, the Court looks at the degree of skill required for Hickey's work. Hickey does not dispute that his work required a high degree of skill. (ECF No. 40 at 11). Defendants agree. (ECF No. 32-1 at 18). Nevertheless, this factor does not weigh in favor of independent contract status anytime a worker is skilled at their job. *See McFeeley*, 825 F.3d at 244 (stating

that even the most skilled ballerina in the best ballet would not automatically be an independent contractor because of her skill); *Chavez-Deremer*, 147 F.4th at 407. In *Chavez-Deremer*, the Fourth Circuit fleshed this factor out, explaining that:

> [T]he worker's economic dependence on the putative employer is central to the degree of skill inquiry. That is, it is not only whether the workers "have some unique skill set" but also whether they possess "some ability to exercise significant initiative within the business." *See Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 387 (5th Cir. 2019) (collecting cases). In other words, the relevant inquiry includes an assessment of whether the workers use their skills "in any independent way" to secure business opportunities or "find job assignments." *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988).

*Id.* (quoting *Parrish*, 917 F.3d at 887). As discussed for the first factor, above, he record in this case reflects Hickey's ability to exercise significant initiative. He was able to set and execute his own work schedule and strategy. (ECF No. 32-2 at 3 ¶¶ 15–17) Hickey's degree of skill in combination with his independence means this factor weighs in favor of his having been an independent contractor.

**Fifth**, the Court considers the permanence of the working relationship. "The more permanent the relationship, the more likely the worker is to be an employee." *Schultz*, 466 F.3d at 309. Moreover, "'employees usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Chavez-Deremer*, 147 F.4th at 408 (quoting *Keller v. Miri Microsys. LLC*, 781 F.3d 799, 807 (6th Cir. 2015)). Defendants assert that this factor weighs in their favor because Hickey's relationship with TTi lasted only seven months. (ECF No. 32-1 at 18) This factor is "entitled to only modest weight in assessing employee status under the FLSA." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 921 (S.D.N.Y. 2013).

18

*Sixth*, the Court assesses the degree to which services rendered are integral to TTi's business. Defendants concede that Hickey was "admittedly, a key part of TTi's business" and that this factor weighs towards employee status (ECF No. 32-1 at 20).

*Considering all the factors together*, this Court holds that Hickey was an independent contractor. The first, second, third, and fourth factors weigh heavily in favor of this finding. The fifth and sixth factors do not overcome the other four. As an independent contractor, Hickey is not able to recover under the FLSA or the Maryland wage laws, making summary judgment on Counts I–III proper for Defendants.

### b.  Whether Maryland's Wage Laws Apply Extraterritorially (Counts II–III)

Separate from their argument on Hickey's independent contractor status, Defendants also argue that they are entitled to summary judgment on Counts II and III because Maryland's wage laws do not apply extraterritorially, rendering Hickey unable to recover under them. (ECF No. 32 at 12–21) The Court's determination, above, that Hickey was an independent contractor makes this a moot point. Nevertheless, for the reasons stated on the record and the reasons that follow, the Court rules in the alternative that Maryland's wage laws do not apply extraterritorially to Hickey's fully remote work in Michigan. Therefore, Defendants are entitled to summary judgment on Counts II and III.

Count II of the Complaint (ECF No. 1 ¶¶ 66–75) alleges that Defendants violated the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401 et seq. (West 2025), by not paying Hickey any wages during August and September 2022. Count III (Id. ¶¶ 76–83) alleges a similar violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 et seq. (West 2025).

In applying Maryland law as the Court does here, "[i]f the relevant state law is established by a decision of '[Maryland's] highest court,' that decision is 'binding on the federal courts.'" *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 44 (2018) (quoting *Wainwright v. Goode*, 464 U.S. 78, 84 (1983) (per curiam)). If no decision from the Maryland Supreme Court exists, the Court's responsibility is to anticipate its decision and apply it. *Poudel v. Mid Atl. Pros., Inc.*, 115 F.4th 287, 292 (4th Cir. 2024) (quoting *Zeigler v. Eastman Chem. Co.*, 54 F.4th 187, 194 (4th Cir. 2022)). Moreover, federal district courts in this Circuit, including this Court, consider themselves bound by the Fourth Circuit's prediction about a state's highest court's would-be decision. *See Trimble v. Am. First Fin., LLC*, 778 F. Supp. 3d 675, 681 n.6 (D. Md. 2025) (Bennett, J.); *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 631 (D. Md. 2015) (citations omitted).

The Maryland Supreme Court has long employed the presumption against extraterritoriality in interpreting its own statutes. *Chairman of Bd. of Trs. of Emps.' Ret. Sys. v. Waldron*, 401 A.2d 172, 177 (Md. 1979) (citing *Sandberg v. McDonald*, 248 U.S. 185, 195 (1918)); *London Guar. & Accident Co. v. Balgowan S.S. Co.*, 155 A. 334, 336 (Md. 1931). The presumption is a rule of statutory construction which provides that a law is presumed not to have any effect outside the State's borders unless "intent to the contrary is expressly stated." *Waldron*, 401 A.2d at 177 (citing *Sandberg*, 248 U.S. at 195; *accord London Guar. & Accident Co.*, 155 A. at 336 ("Inherently no state statute has any extraterritorial force."). Neither the MWHL nor the MWPCL contains an express intent for extraterritorial application, meaning that the presumption applies. Moreover, the Fourth Circuit, in *Poudel*, conclusively determined that the

presumption against extraterritoriality applies to both the MWHL and MWPCL. 115 F.4th at 297.

In *Poudel*, the Fourth Circuit answered a question that the Maryland Supreme Court had yet to evaluate: "whether the [MWHL and MWPCL] apply to employees of a Maryland-based company that performed no work in the state." *Id.* at 292. The *Poudel* court ruled that they do not. *Id.* Looking at Maryland cases, the court determined that the presumption against extraterritoriality applied to both laws. *Id.* It furthered ruled that the laws are not triggered unless at least some portion of the work at issue had been performed within Maryland's borders. *Id.*

Applying that rule here, the MWHL and MWPCL do not apply extraterritorially to Hickey's work in Michigan. Hickey concedes that he never worked physically in Maryland. (ECF No. 40 at 3). That is sufficient to decide the question under *Poudel*. Hickey was barred from bringing Counts II and III.

Despite this clear rule, Hickey's counsel argued at the hearing on this Motion that *Poudel* is distinguishable. (ECF No. 48) Counsel asserted that the presumption is not triggered by Hickey's remote work in Michigan because his work had such extensive connections to Maryland that it was effectively done in Maryland. (*Id.*) To support this argument, Counsel attempted to distinguish *Poudel* on its facts. (*Id.*) There, the appellants had worked in Kabul, Afghanistan as Nepalese-English interpreters for appellee Mid Atlantic Professionals and used under the MWHL and MWPCL to recover lost wages. *Id.* at 289–90. Just as here, the appellants in *Poudel* never worked in Maryland. *Id.* Hickey's counsel's argument seems to be that business development consulting, with its video conferences and weekly meetings with staff seated in

Maryland, is nothing like translator work done in Afghanistan. (*Id.*) Though that may be true, it provides no support for the underlying argument that Hickey was effectively working in Maryland. The Fourth Circuit's *Poudel* opinion sets a boundary on the application of the MWHL or the MWPCL: the laws are not triggered unless at least some work is actually done in Maryland. *Id.* at 292.

Hickey's argument that the presumption is not triggered here also misread *Poudel*. There, the Fourth Circuit stated that Maryland's strong public policy in favor of the wage laws' application did not suffice to overcome the fact that "no caselaw . . . extends the public policy to conduct with no ties to Maryland." *Id.* at 293. Hickey claims that he is different because he had ties to Maryland, specifically that his colleagues were in Maryland. That misunderstands the Fourth Circuit's decision. *Poudel* found that the MWHL and MWPCL did not apply to the appellants in that case because they were never in Maryland. *Id.* That is, the relevant "conduct with [] ties to Maryland" must be the conduct of the party seeking to come into court under the wage laws, not the conduct of the Maryland-based putative employer.

In summary, Maryland's wage laws do not apply extraterritorially to Hickey's work in Michigan. Therefore, Hickey was not allowed to bring claims under them against Defendants. Accordingly, summary judgment is proper for Defendants as to Counts II and III.

### c.  Hickey Concedes that TTi is Entitled to Summary Judgment on Count IV

In Count IV, Hickey alleges a breach of contract claim against TTi. (ECF No. 1 ¶¶ 84–90) TTi moved for summary judgment on that count on the basis that Hickey was not party to the Consulting Agreement between TTi and Performance Concepts. (ECF No. 32 at 22) In

his papers and again at oral argument, Hickey's counsel conceded that point. (ECF No. 40 at 2 n.1; ECF No. 48) As such, the Court GRANTS summary judgment to TTi on Count IV.

### d. Conclusion

For the reasons given on the record and listed above, the Court GRANTS Defendants' Motion for Partial Summary Judgment (ECF No. 32) in its entirety.

## II.  <u>Counterdefendants' Motion for Partial Summary Judgment (ECF No. 33)</u>

Counterdefendants Hickey and Performance Concepts move for partial summary judgment on TTi's Counterclaim.[4] (ECF No. 33) The four counterclaims in this case all concern the same factual allegations. (ECF No. 8) TTi alleges that Performance Concepts and Hickey solicited and diverted business away from TTi to another company called Excelerant. (*Id.*) TTi claims that Hickey and Performance Concepts took actions which caused two companies with whom TTi had or was attempting to have client relationships, Sirtex and Dickson, to leave TTi and engage Excelerant. (*Id.*) TTi alleges that the timing of these transactions maps onto the end of Hickey's working relationship with TTi and the beginning of his relationship with Excelerant. (*Id.*) At the hearing on this Motion (ECF No. 48), the Court indicated that it would deny summary judgment on Counts I and IV because there are genuine disputes of material fact. For the same reason, the Court indicated that it would deny summary judgment as to Counterdefendant Hickey on Counts II and III. (*Id.*) Finally, the Court indicated, without much argument from TTi's counsel, that summary judgment would be entered for Performance Concepts on Counts II and III. (*Id.*)

---

[4] Defendant Dr. Zambelli-Weiner is not party to the Counterclaim, only TTi. (ECF No. 8)

### a. Counts I and IV: Breach of Contract and Indemnification

TTi's Count I alleges a breach of contract and Count IV alleges entitlement to indemnification flowing from that breach. (ECF No. 8). These counts go together, as the Consulting Agreement stipulates that indemnification will only lie according to a finding of a breach of contract. (ECF No. 32-2 at 10). As mentioned above, these counts allege that Performance Concepts, party to the Consulting Agreement, breached its obligations under the Agreement by using TTi's proprietary information for purposes not allowed by the Agreement, including to solicit and divert TTi's former, current, and prospective clients away from TTi and for Performance Concepts' and Hickey's benefit. (ECF No. 8 at 17 ¶¶ 20–28)

Performance argues in its Motion (ECF No. 33-1 at 3) and reiterated at the hearing (ECF No. 48), that summary judgment is proper on these counts because TTi cannot meet its burden of production. Specifically, Performance Concepts alleges that TTi cannot show that Performance Concepts used any of TTi's proprietary information to solicit business for the benefit of Hickey or Performance Concepts. (*Id.*) It further contends that the existence of certain prospective client names were not proprietary information of TTi. (*Id.*) Finally, Performance Concepts argues that TTi cannot show causation. (*Id.*)

In Opposition (ECF No. 39), TTi responds that its breach of contract claim is not based solely on the provision of the Consulting Agreement that prohibits Performance Concepts from using TTi's information to *solicit* business, but primarily on the provision that prohibits *diverting* business from TTi. (*Id.* at 3) Accordingly, the question of solicitation is immaterial, making Performance Concepts' argument in favor of summary judgment on that claim unavailing. (*Id.* at 3–4) Nevertheless, TTi contends that there is sufficient evidence for a

reasonable factfinder to find that Performance Concepts did use TTi's information to solicit business. (*Id.* at 4). Finally, TTi contends that there is a genuine dispute of material fact about whether Performance Concepts used TTi's proprietary information to divert the Sirtex and Dickson business from TTi to another firm for Hickey's benefit. (*Id.* at 7)

In Reply, Performance Concepts argues that, if the Court does not enter summary judgment for it on Counts I and IV, it would be making "inferences that are not only unreasonable, but rise to the level of mere conjecture and speculation." (ECF No. 42 at 2)

As the Court noted on the record, summary judgment is improper on these counts. (ECF No. 48) Put simply, the parties offer two very different sides of the same story. *See Grp. Home on Gibson Isl., LLC v. Gibson Isl. Corp.*, 144 F.4th 522, 539 (4th Cir. 2025) (explaining that summary judgment is not appropriate where there are two sides to the same story). TTi contends that Performance Concepts breached the Consulting Agreement by soliciting and diverting business away from TTi. (ECF No. 8) The parties genuinely disagree over multiple material facts, as the hearing on this Motion made clear. (ECF No. 48) Summary judgment is denied.

### b. **Counts II and III: Tortious Interference with Business Relations and Misappropriation of Trade Secrets**

On the same facts, Counts II and III allege against both Performance Concepts and Hickey two business torts. Count II alleges tortious interference with business relations. (ECF No. 8 at 18–19 ¶¶ 29–32) Count III alleges misappropriation of trade secrets under the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law II §§ 11-201 *et seq.* (West 2025). (*Id.* at 19–20 ¶¶ 33–40) These claims contain the same factual allegations as Count I.

To prove tortious interference with business relations, a plaintiff must show "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of defendants (which constitutes malice); and (4) actual damage and loss resulting." *Blondell v. Littlepage*, 991 A.2d 80, 97 (Md. 2010) (quoting *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003)).

"To prove misappropriation of a trade secret [under the MUTSA], a plaintiff must show (1) that it possessed a valid trade secret, (2) that the defendant acquired its trade secret, and (3) that the defendant knew or should have known that the trade secret was acquired by improper means." *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018) (alteration in original). The Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-1201(e) (West 2025), defines a trade secret as any information that the owner "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and takes reasonable efforts to maintain its secrecy. As Judge Gallagher of this Court has noted, in determining "whether information is a trade secret, Maryland courts assess: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which it is known by employees and others involved in plaintiff's business; (3) the extent of measures taken by plaintiff to guard the secrecy of the information; (4) the value of the information to plaintiff and competitors; (5) the amount, effort, or money expended by plaintiff in developing the information; and (6) the ease or difficulty with which the

information could be acquired or duplicated by others." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020) (collecting cases).

With respect to Counterdefendant Hickey, the papers are rife with genuine disputes of material fact, and so were the arguments at the hearing. (ECF No. 48) Just as with Counts I and IV, the parties dispute interference with TTi's relationships with Sirtex and Dickson. They also dispute whether certain information was proprietary, whether Hickey used any proprietary information for his own gain, and whether he did so with the intent to harm TTi. That makes Count II unfit for summary judgment for Hickey. The same is true for Count III, which is similar in kind to Count II. The parties genuinely dispute material facts throughout Count III. That makes summary judgment inappropriate for Hickey on those counts.

The same cannot be said for Performance Concepts. Despite TTi's attempt to put Hickey and Performance Concepts together as Counterdefendants on these claims, it is evident that if any tortious interference or misappropriation of trade secrets occurred, it was done by Hickey as Senior Vice President of Business Development for TTi, and later as a consultant for Excelerant. There is no evidence offered by either party to suggest that Performance Concepts as an entity was committing either of the torts alleged in Counts II and III. Hickey's counsel conceded as much at the hearing on this Motion. (ECF No. 48) Therefore, the Court should grant summary judgment to Performance Concepts on Counts II and III.

### c. Conclusion

For the reasons given on the record and listed above, the Court DENIES Counterdefendants' Motion for Partial Summary Judgment (ECF No. 33) on Counts I and

IV. The Court further DENIES summary judgment as to Counterdefendant Hickey on Counts II and III, and GRANTS summary judgment as to Counterdefendant Performance Concepts on the same.

### III.    <u>Jurisdiction</u>

In light of this Court's ruling with respect to Hickey's personal Fair Labor Standards Act claim, an analysis of the continued exercise of jurisdiction is merited. This Court's jurisdiction was originally predicated on that claim as it arose under the Fair Labor Standards Act. 28 U.S.C. § 1331; *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). (ECF No. 1 ¶ 6) The initial Complaint (ECF No. 1) did not allege diversity jurisdiction under 28 U.S.C. § 1332. Nevertheless, the four-count Counterclaim did clearly allege diversity jurisdiction. (ECF No. 8 at 14 ¶ 5) There is clearly diversity jurisdiction in this case. Plaintiff Performance Concepts is incorporated and has its principal place of business in Michigan and the individual Plaintiff Hickey is a citizen of Michigan. (*Id.*) Furthermore, the Defendant and Counterclaimaint TTi is incorporated in and has its principal place of business in Maryland. (*Id.*) In addition, both the breach of contract claim in the original Complaint (ECF No. 1) and Counterclaim Counts I and II (ECF No. 8) allege damages claim in excess of $75,000.

## CONCLUSION

For the reasons stated on the record and further explained above, the Court GRANTS Defendants' Motion for Partial Summary Judgment (ECF No. 32). Additionally, with respect to Counterdefendants' Motion for Partial Summary Judgment on TTi's counterclaims (ECF No. 33), the Court DENIES summary judgment on Counts I and IV. It further DENIES summary judgment as to Counterdefendant Hickey on Counts II and III. Finally, the Court GRANTS summary judgment as to Counterdefendant Performance Concepts on Counts II and III.

A separate Order follows.

Date: November 14, 2025

/s/
_____
Richard D. Bennett
United States Senior District Judge